UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CASE NO. 2:20-CR-00131-01** |
| **VERSUS** | : | **JUDGE JAMES D. CAIN, JR.** |
| **DEXTER O MAYES (01)** | : | **MAGISTRATE JUDGE KAY** |

**REPORT AND RECOMMENDATION**

Before the court is a Motion to Suppress filed by defendant Dexter Mayes. Doc. 81. Through this motion, defendant seeks to suppress evidence obtained from a search of his vehicle. After the parties submitted briefing on this issue [docs. 83, 85], the court held a hearing on the motion and ordered supplemental briefing, which the parties have supplied. Docs. 97, 100, 101. Based on our review of the memoranda filed by the parties and the evidence adduced at the hearings, we **RECOMMEND** that the motion be **DENIED.**

**I.**
**BACKGROUND**

At hearing, Sergeant Derek Goss provided the following testimony: In March, 2019, officers from the Calcasieu Parish Sheriff's office Combined Anti-Drug Task Force (the "CAT Team") made a street-level arrest of an individual ("Source One") who was found in possession of approximately five ounces of methamphetamine, and who identified Dexter Mayes as his supplier. Doc. 93, p. 8-9. At that point, Mayes became a target of investigation. *Id.*, p. 9-10. Source One provided officers with ongoing information about defendant's alleged involvement in narcotics trafficking, including giving officers Mayes' phone number, describing a vehicle

frequently used by Mayes, identifying locations he frequented, and providing the name and address of the girlfriend with whom he frequently resided. *Id.* at 11. After corroborating the information provided by Source One, officers considered the information provided by Source One reliable. *Id.* Around the same time, officers began receiving information from a second source about defendant ("Source Two"). *Id.* Source Two provided the same phone number as had been provided by Source One, described a similar vehicle associated with Mayes, and provided consistent information identifying Mayes as a distributor of "large amounts of crystal methamphetamine, as well as other narcotics in the Calcasieu Parish area, as well as other areas in the state of Louisiana." *Id.* at 12.

After Sources One and Two confirmed that the phone number they had provided was used to conduct narcotics transactions, officers sought a search warrant to conduct what is known as a "cell phone ping" of that number in May, 2019. *Id.* at 12-13. A "cell phone ping" warrant allows law enforcement to receive a cellular GPS location associated with the phone number and does not include messages or conversations conducted with the phone. *Id.* at 15. Sergeant Goss testified that the affidavit supporting the cell phone ping warrant request included a generalized summary of the background information described above, including the cell phone number identified by both sources as having been involved in narcotics transactions and the fact that Source One "admitted to recently being supplied large amounts of crystal methamphetamine from Mayes in the past." *Id.* at 14, 22, 24 (referencing Affidavit of Derek Goss, exhibit D-1 to the 8/17/22 hearing). Although defendant now challenges the validity of that warrant, arguing that it was supported by only a "bare-bones" affidavit of "stale" information [doc. 97], Judge Michael Canaday of the 14th Judicial District Court for the Parish of Calcasieu, Louisiana, issued a cell phone ping warrant on May 14, 2019, based on his apparent finding of probable cause. *Id.* at 14-15 (warrant introduced as exhibit D-1 to the 8/17/22 hearing).

Around the time they obtained the cell phone ping warrant, officers received information that Mayes planned to travel to Houston, Texas in a black Mercedes sedan to pick up a large quantity of crystal methamphetamine and return with it to Louisiana. *Id.* at 16. On May 18, 2019, after observing Mayes to be in Lake Charles, Louisiana, via physical surveillance as well as active phone ping, officers observed Mayes' cell phone travelling to Houston, Texas. *Id.* at 17. Once he was in Texas, officers conducted "physical group surveillance" of Mayes by following his movements in Texas. *Id.* at 18-19. When he began to travel back toward Louisiana, officers alerted a patrol officer in Louisiana to pick up surveillance on Mayes. *Id.* at 19.

Corporal Maddox with the Lake Charles Police Department, who is also a member of the CAT Team, testified that he was on duty as a criminal patrol officer assigned to Interstate 10 on May 18, 2019. *Id.* at 54-55. He received information that a possible drug courier, Dexter Mayes, was returning from Houston to Lake Charles in a black Mercedes sedan, potentially with a large amount of narcotics. *Id.* at 56. Corporal Maddox was informed of the nature of the information the officers had received about Mayes as well as the physical surveillance being maintained on him. *Id.* at 19. He was directed to make a traffic stop on the vehicle if he developed his own independent probable cause to do so. *Id.* at 56, 71. He observed a vehicle matching the description of Mayes' vehicle commit a moving violation when it "pushed to the outside lane and hit the white fog line," while passing his stationary patrol car, an offense for which he has issued tickets in the past. *Id.* at 57. He found the movement suspicious because it may have indicated that the driver was instinctively trying to create distance from the patrol car. *Id.* at 58-59. After merging into traffic and catching up to the vehicle, Corporal Maddox observed the car "hugging" the fog line "as if he was maybe paying attention to something else than the road in front of him." *Id.* at 60-61. While trailing the vehicle he ran registration and vehicle checks and discovered that the license

plates being displayed on the vehicle were cancelled plates and that the vehicle should have had a newly registered Texas tag on it but did not. *Id.* at 61. This was an additional traffic violation for which he had written tickets in the past, and he decided to initiate a traffic stop. *Id.* He determined that the two traffic violations gave him probable cause to stop the vehicle, independent from the information he had received about Mayes' suspected activity earlier in the day. *Id.* at 67.

After pulling the vehicle over using his overhead lights and siren, Corporal Maddox approached the passenger side of the car and immediately smelled the strong odor of marijuana through the open passenger window. *Id.* at 62-63. The smell made him suspect that there was marijuana in the vehicle, suggestive of criminal activity. *Id.* at 63. Corporal Maddox confirmed that Dexter Mayes was the driver of the vehicle. *Id.* at 63. Mayes admitted to having smoked marijuana earlier in the day, and the passenger admitted to having been smoking a marijuana cigarette at the time of the stop. *Id.* at 64. Corporal Maddox informed driver and passenger that they would be detained pending a search of the vehicle. *Id.* at 64. After being joined on the scene by his partner Sergeant Chad Booth, he searched the vehicle and found approximately 25 pounds of crystal methamphetamine concealed in a grocery bag in the trunk. *Id.* at 65.

When he later prepared his report of the traffic stop, Corporal Maddox testified that he described both traffic infractions, hitting the fog line and driving with cancelled plates, but he used the wrong statute number to designate the latter offense.

## II.
### THE PARTIES' ARGUMENTS

Defendant argues that the evidence seized because of the traffic stop should be suppressed for two reasons. First, defendant argues that the cell phone ping warrant issued by the state-court judge was supported by a "bare bones affidavit" based on stale information that could not give rise to probable cause in the mind of the state-court judge who issued it. Doc. 97, p. 1. He suggests

that, because the information obtained from ping warrant had a causal connection to the later traffic stop, the evidence obtained from the vehicle search should be excluded. *Id.* at 2.

Second, defendant argues that Corporal Maddox did not have reasonable suspicion to execute a traffic stop on Mayes' vehicle because—he argues—merely touching the fog line is not a traffic violation. Doc. 97, p. 23. He argues that Louisiana courts require a vehicle to fully cross the fog line to be a traffic violation. He implies that the moving violation, touching the fog line, was manufactured attempt to "develop" probable cause.

As to defendant's first argument, the government responds that the ping warrant was supported by a finding of probable cause. The government further argues that, even if deficient, because the affidavit supporting the warrant is not a "bare bones" affidavit, the officers were entitled to obtain evidence as a result of objectively reasonable reliance on the warrant. Doc. 85, p. 5.

As to defendant's second argument, the government argues that Corporal Maddox had two proper bases for conducting a traffic stop: observing the vehicle strike the fog line and confirming that it displayed canceled plates. Doc. 100, p. 3. Given his testimony that he immediately smelled marijuana on approaching the vehicle and received verbal confirmation that the passenger was still in possession of marijuana, he had probable cause to search the vehicle for narcotics. Doc. 100, p. 3.

### III.
#### LAW AND ANALYSIS

**A. The good faith exception to the exclusionary rule applies to the ping warrant.**

As noted above, defendant argues that, because the ping warrant was not supported by probable cause, any evidence obtained as a result of the ping warrant should be excluded.

The Fourth Amendment's protection of "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" includes "vehicle stops and temporary detainment of a vehicle's occupants." U.S. Const. amend. IV; *United States. v. Andres*, 703 F.3d 828, 832 (5th Cir. 2013). The Fourth Amendment is silent as to the ramification for an unlawful search or seizure but the jurisprudentially created "exclusionary rule prohibits the introduction at trial of all evidence that is derivative of an illegal search, or evidence known as the 'fruit of the poisonous tree.' " *United States v. Singh,* 261 F.3d 530, 535 (5th Cir. 2001) (citing *United States v Grosenheider*, 200 F.3d 321, 327 (5th Cir. 2000)).

Courts have developed a "good-faith exception" to the exclusionary rule provides that when evidence is obtained by law-enforcement officers as a result of objectively reasonable reliance on a warrant, the evidence will not be suppressed even if the affidavit on which the warrant was based was insufficient to establish probable cause. *United States v. Cisneros*, 112 F.3d 1272, 1278 (5th Cir. 1997). "An officer may rely in good faith on the validity of a warrant so long as the warrant is supported by more than a 'bare bones' affidavit." *Id.* at 1278. In reviewing suppression motions, courts have the discretion to proceed directly to an analysis of the good-faith exception to the exclusionary rule announced in *United States v. Leon*, without first addressing the underlying Fourth Amendment question. 104 S. Ct. 3405, 3421-22 (1984). We do so here.

"'Bare bones' affidavits contain wholly conclusory statements, which lack the facts and circumstances from which a magistrate can independently determine probable cause." *United States v. Satterwhite*, 980 F.2d 317, 321 (5th Cir. 1992) (citing *United States v. Brown*, 941 F.2d 1300, 1303 n. 1 (5th Cir.)). The affidavit here was not based on wholly conclusory statements. The affidavit of Derek Goss described two sources of information that identified a cell phone number that each source knew to be associated with Mayes' past narcotics transactions. The

affidavit also noted that Source One "admitted to recently being supplied large amounts of crystal methamphetamine from Mayes in the past." *Id.* at 14, 22, 24 (referencing Affidavit of Derek Goss, exhibit D-1 to the 8/17/22 hearing).

Information found in the affidavit lifts it above the level of a bare bones affidavit and the officers were entitled to rely on the validity of the warrant it supported; accordingly, the good faith exception applies. Having concluded that the good faith exception to the exclusionary rule applies, any deficiency in the cell phone ping warrant does not require the exclusion of evidence seized.

**B. The traffic stop did not violate defendant's Fourth Amendment rights.**

Defendant next argues that the traffic stop was improperly initiated and impermissibly extensive in its scope and duration.

Generally, the proponent of a motion to suppress bears the burden of proving by a preponderance of the evidence that the evidence in question was obtained in violation of his or her Fourth Amendment rights. *United States v. Iraheta*, 764 F.3d 455, 460 (5th Cir. 2014). Where, as here, the search is conducted without the benefit of a warrant, then the burden shifts to the Government to prove by a preponderance of the evidence that its actions were constitutional. *United States v.Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001).

The constitutionality of a traffic stop is analyzed under the two-part framework promulgated by the Supreme Court in *Terry v. Ohio.* 88 S. Ct. 1868 (1968). The *Terry* test requires courts to "determine whether the stop was justified at its inception," and, if so, "whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop of the vehicle in the first place." *Andres*, 703 F.3d at 832 (quoting *United States v. Macias*, 658 F.3d 509, 517 (5th Cir. 2011)). An analysis of a traffic stop under *Terry* also mandates that "courts must allow law enforcement 'officers to draw on their own experience and specialized

training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person.'" *United States v. Brigham,* 382 F.3d 500, 507 (5th Cir. 2004) (internal quotations omitted). Further, under the "collective knowledge" doctrine, officers can rely on information from other law enforcement agencies or personnel even if the officer does not have personal knowledge of the evidence creating a reasonable suspicion of the activity reported from the other agency. *See United States v. Hensley*, 105 S. Ct. 675, 682 (1985).

The initial inquiry under *Terry* is satisfied if the officer has "an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle." *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005). In addition, "[s]o long as a traffic law infraction that would have objectively justified the stop ha[s] taken place, the fact that the police officer may have made the stop for a reason other than the occurrence of the traffic infraction is irrelevant for purposes of the Fourth Amendment...." *Goodwin v. Johnson*, 132 F.3d 162, 173 (5th Cir. 1997).

The second portion of the *Terry* framework requires the that the detention "be temporary and last no longer than is necessary to effectuate the purpose of the stop, unless further reasonable suspicion, supported by articulable facts, emerges." *Brigham*, 382 F.3d at 507. During the stop, "a police officer may permissibly examine the driver's license and registration and run a computer check on them to investigate whether the driver has any outstanding warrants and if the vehicle is stolen." *Lopez-Moreno*, 420 F.3d at 430. Such inquiry "may be wide-ranging." *Id.* at 431. Officers "may also ask about the purpose and itinerary of a driver's trip during the traffic stop." *Brigham*, 382 F.3d at 508 (citing *U.S. v. Gonzales*, 382 F.3d 755, 758-59 (5th Cir. 2003)). However, "once all relevant computer checks have come back clean, there is no more reasonable suspicion, and, as a general matter, continued questioning thereafter unconstitutionally prolongs the detention."

*Lopez-Moreno*, 420 F.3d at 431. The stop may continue if "the Government can show an exception to the Fourth Amendment that allows the stop to continue." *United States v. Peña-Gonzales*, 618 Fed. App'x 195, 198 (5th Cir. 2015) (citing *Rodriguez v. United States*, 135 S. Ct. 1609, 1614 (2015)). A common exception derived from *Terry* permits extension of the stop if reasonable suspicion of additional criminal activity emerges or existed in the first place. *Id.*

Reasonable suspicion requires an amount of proof "considerably less than proof of wrongdoing by a preponderance of the evidence,' and 'obviously less' than is necessary for probable cause[.]" *Navarette v. California*, 134 S. Ct. 1683, 1687 (2014) (quoting *United States v. Sokolow*, 109 S. Ct. 1581, 1585 (1989))(alteration added). But "reasonable suspicion is more than a mere hunch," and it must be supported by "specific and articulable facts" and "rational inferences from those facts." *United States v. Monsivais*, 848 F.3d 353, 357 (5th Cir. 2017) (citations omitted). If additional grounds for suspicion emerge after the initial stop, the stop may extend "as long as is reasonably necessary" to resolve such suspicion. *United States v. Fishel*, 467 F.3d 855, 856 (5th Cir. 2006) (quoting *Brigham*, 382 F.3d at 512). A court's determination of the existence of reasonable suspicion requires an examination of "the totality of the circumstances in the situation at hand, in light of the individual officers' own training and experience." *Monsivais*, 848 F.3d at 357 (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)) (internal quotations omitted).

Restated simply, a traffic stop is not an unconstitutional seizure of the person if the officer has a reasonable suspicion that illegal activity, such as a traffic violation, has occurred. Once the officer has concluded the business related to the initial constitutional stop, he may thereafter continue to hold the accused if he has reasonable suspicion that other criminal activity is afoot and

may continue that hold the suspect until the officer is satisfied that the criminality is or is not occurring. The continued hold is likewise not unconstitutional seizure of the person.

In this matter, Corporal Maddox testified that, from his position in a stationary patrol car parked perpendicular to the flow of traffic, he observed a black Mercedes sedan pass in front of his car and move toward the outside of its lane, onto the fog line. Doc. 93 at 57. Corporal Maddox also testified that he had been trained to identify certain vehicle movements as indicative of a nervous driver or one involved in criminal activity. Id. at 58. He interpreted the perhaps unconscious movement away from the patrol car, and toward the fog line, as just such a suspicious vehicle movement. When he began following the car, he observed it again hugging the fog line as if distracted, which he also interpreted as suspicious. Corporal Maddox's suspicions were confirmed when he determined that the vehicle displayed a cancelled license plate and should have displayed a newly registered Texas tag. *Id.* at 61.

As noted above, defendant argues that the initial infraction, "hitting" the fog line, is not sufficient to give rise to reasonable suspicion for an investigatory stop on its own. The fog line infraction alone would support an investigatory spot given Corporal Maddox's experience and specialized training on which he is entitled to draw when he made inferences and deductions about the driver being involved in potential criminal activity, *United States v. Brigham,* 382 F.3d 500, 507 (5th Cir. 2004). But the argument also ignores the license plate violation which undoubtedly gave Corporal Maddox authority to stop. The initial inquiry under *Terry* is satisfied here because Corporal Maddox initiated the stop based upon "an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation," had occurred, namely, the moving violation of touching the fog line and the awareness that the vehicle was displaying cancelled license plates. *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005).

The *Terry* inquiry next asks us to consider the duration of the stop. Corporal Maddox testified that he perceived the smell of marijuana, a controlled substance, coming from the open passenger window on approaching the vehicle, and that both occupants admitted to smoking marijuana that day. Doc. 93 at 62-63. When these additional grounds for suspicion emerged after the initial stop, Corporal Maddox was permitted to extend the stop "as long as is reasonably necessary" to resolve his reasonable suspicion concerning the presence of illegal narcotics. *See United States v. Fishel*, 467 F.3d 855, 856 (5th Cir. 2006) (quoting *Brigham*, 382 F.3d at 512). He testified that he asked the occupants to exit the vehicle and conducted a search for drugs, which resulted in finding 25 pounds of crystal methamphetamine. *Id.* at 65. This search was necessary to resolve the reasonable suspicion he developed. We therefore find that second portion of the *Terry* framework is satisfied because the detention was "no longer than is necessary to effectuate the purposes of the stop." *Brigham*, 382 F.3d at 507.

## V.
### CONCLUSION

For the reasons given we **RECOMMEND** the Motion to Suppress [doc. 81] be **DENIED**.

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days from receipt of this Report and Recommendation to file written objections with the Clerk of Court. Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within fourteen (14) days of receipt shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error. *See Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1429–30 (5th Cir. 1996).

THUS DONE AND SIGNED in Chambers this 18th day of April, 2023.

_____
KATHLEEN KAY
UNITED STATES MAGISTRATE JUDGE